IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| KAI JOHNSON, | CV 25-60-M-KLD |
| Plaintiff, | |
| vs. | ORDER |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| Defendant. | |

Plaintiff Kai Johnson, a college basketball player at the University of Montana, moves for a preliminary injunction to enjoin the Defendant National Collegiate Athletic Association ("NCAA") from enforcing the Five-Year Rule and related eligibility rules that will prevent him from competing in the 2025-2026 basketball season. (Doc. 6). Because Johnson has not made a clear showing that he is likely to succeed on the merits, his motion is denied.

## I.    **Background**

The Court held a preliminary injunction hearing on June 11, 2025, during which the parties presented oral argument, but did not call any witnesses or provide additional evidentiary materials. Accordingly, the following facts and analysis are based on the declarations and documentary evidence submitted with the briefing. (Doc. 6-2; Doc. 10; Docs. 24 through 24-4; Doc. 31).

A.      **NCAA Eligibility Rules**

As described in the declaration provided by the NCAA's Director of

Academic and Membership Affairs, Brandy Hataway, the NCAA is a voluntary,

self-governing association of approximately 1,100 member schools that are

organized into three divisions: Division I, Division II, and Division III. (Doc. 24 at

¶ 4). The NCAA has promulgated—and member schools have adopted—eligibility

rules to ensure fair competition in sports, to enhance the product of collegiate

sports, to maintain a balance between academics and athletics for collegiate

student-athletes, and to ensure that collegiate sporting events continue to attract the

interests of fans. (Doc. 24 at ¶ 7).

Johnson seeks to enjoin the enforcement of three eligibility rules that are

part of the NCAA Division I Bylaws: (1) the Five-Year Rule (Bylaw 12.8.1),

which limits student-athletes to four season of competition within five years from

their full-time enrollment at any NCAA collegiate institution; (3) the

Intercollegiate Competition Rule (Bylaw 12.02.6), which defines intercollegiate

competition to include participation at any collegiate level, including seasons

played at any school in Division I, II, or III or at a two-year institution;[1] and (3) the

Rule of Restitution (Bylaw 12.11.4.2), which allows the NCAA to impose

---

[1] The Court will refer to the Five-Year Rule and Intercollegiate Competition Rule
collectively as the "Challenged Rules."

2

retroactive penalties on a member institution if an otherwise ineligible student-athlete is allowed to compete in accordance with an injunction that is later vacated, reversed, or invalidated.

The Five-Year Rule is part of NCAA Division I Bylaw 12.8, which provides in relevant part:

**12.8 Seasons of Competition: Five-Year Rule.** A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport (see Bylaws 12.02.6 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all seasons of participation in all sports within the time periods specified below:

**12.8.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted. For international students, service in the armed forces or on an official religious mission of the student's home country is considered equivalent to such service in the United States.

> **12.8.1.1 Determining the Start of the Five-Year Period.** For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution (domestic or foreign; see Bylaw 14.02.4) when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum full-time program of studies, as determined by the institution, and attends the student's first day of classes for that term (see Bylaw 12.8.2)

(Doc. 24-1 at 37). The Intercollegiate Competition Rule provides:

**12.02.6 Intercollegiate Competition.** Intercollegiate competition is considered to have occurred when a student-athlete in either a two-year or a

four-year collegiate institution does any of the following:

(a) Represents the institution in any contest against outside competition, regardless of how the competition is classified (e.g., scrimmage, exhibition or joint practice session with another institution's team) or whether the student is enrolled in a minimum full-time program of studies;

(b) Competes in the uniform of the institution, or, during the academic year, uses any apparel (excluding apparel no longer used by the institution) received from the institution that includes institutional identification; or

(c) Competes and receives expenses (e.g., transportation, meals, housing, entry fees) from the institution for the competition.

(Doc. 24-1 at 17).  The Rule of Restitution provides:

**12.11.4.2 Restitution.** If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of [several listed actions] against such institution in the interest of restitution and fairness to competing institutions.

(Doc. 24-1 at 48-49).

## B.    NCAA Eligibility Waivers

The NCAA Division I and Division II Bylaws include various exceptions to, or opportunities for waivers of, the Challenged Rules. (Doc. 24 at ¶ 14). Relevant here, Division I Bylaw 12.8.1.7 provides for a waiver of the eligibility period of the Five-Year Rule under certain circumstances. (Doc. 24-1 at 39). Under Bylaw 12.8.1.7.1.1, a waiver of the five-year period of eligibility "may be granted, based

upon objective evidence" of "circumstances considered to be beyond the control of the student-athlete or the institution," including if "contemporaneous medical documentation" establishes that the "student-athlete is unable to participate in intercollegiate competition as a result of incapacitating physical or mental circumstances." (Doc. 24-1 at 39). "A waiver of the five-year period of eligibility" under this bylaw "is designed to provide a student-athlete with the opportunity to participate in four seasons of intercollegiate competition within a five-year period." (Doc. 24-1 at 39).

Also relevant here, the NCAA Division II Bylaws provide for a season-of-competition waiver if a student-athlete competed while eligible, but the competition was limited due to extenuating circumstances. (Doc. 24 at ¶ 32). This waiver provision states, in part:

> **14.4.3.7 Season-of-Competition Waiver—Competition While Eligible.** A student-athlete may be granted an additional season of competition by the Student-Athlete Reinstatement Committee when, due to extenuating circumstances (per Bylaw 14.4.3.7.1.3), the student-athlete, while eligible, did not compete in more than three contests or dates of competition (whichever is applicable to that sport) or 30 percent (whichever number is greater) of the maximum permissible number of contests or date of competition set forth in Bylaw 17. …

(Doc. 24-2 at 17). Season-of-competition waivers are evaluated by the NCAA's Student-Athlete Reinstatement ("SAR") staff, and denials can be appealed to the NCAA's SAR Committee. (Doc. 24 at ¶ 30).

To address the impacts of the COVID-19 pandemic, the NCAA Division I

Council and Board of Directors approved a one-time COVID-19 waiver permitting institutions to self-apply a season-of-competition and one-year extension of eligibility waiver for the 2020-2021 seasons, including for men's basketball. (Doc. 24 at ¶ 17). For any student-athlete who competed, the season did not count toward the student-athlete's four seasons of competition or five years of eligibility. (Doc. 24 at ¶ 17). The guidance from the Division I Council to the NCAA membership made clear that this waiver was a restoration of a season of competition for those who participated in the impacted season, meaning that it did not count against those who participated in it, but it did not change the fundamental rule in Division I and Division II that student-athletes gets four seasons of competition. (Doc. 24 at ¶ 18).

Another type of waiver, called a Legislative Relief Waiver ("LRW"), may be available "where the circumstances are extraordinary in nature." (Doc. 24 at ¶ 23). LRWs "are available to member institutions when no other relief is available and the strict application of a rule might disproportionately harm a student-athlete." (Doc. 24 at ¶ 23). LRWs are decided in the first instance by NCAA staff. If NCAA staff deny a LRW waiver, the school may appeal the decision to the Division I Committee for Legislative Relief, which is comprised of NCAA member schools and conferences. (Doc. 24 at ¶ 23).

//

### C.     Johnson's Basketball Career

In August 2020, Johnson enrolled at Western Washington University, a Division II school, where he joined the men's basketball team. (Doc. 10 at ¶ 2). Western Washington cancelled all scheduled games during the 2020-2021 basketball season due to the COVID-19 pandemic. (Doc. 10 at ¶¶ 3-4). Johnson experienced significant academic and mental health struggles as a result of pandemic-related social isolation and the cancellation of the basketball season. (Doc. 10 at ¶¶ 6-13). Johnson's academic and mental health struggles continued into his sophomore year at Western Washington. (Doc. 10 at ¶¶ 14-15). Johnson competed during the 2021-2022 basketball season but started in only two games and averaged just 5.3 points per game. (Doc. 10 at ¶ 16). Johnson's mental health began to improve during his third year at Western Washington, and he started every game during the 2022-2023 basketball season. (Doc. 10 at ¶ 17). The 2023-2024 academic year was even better. Johnson's grades started to improve, and he had his best season on the basketball court, averaging 21.6 points per game and playing an average of 33.2 minutes per game. (Doc. 10 at ¶ 18).

After the 2023-2024 academic year, Johnson transferred to the University of Montana, a Division I school. (Doc. 10 at ¶ 19). Johnson competed for the University of Montana in every game during the 2024-2025 season, including in the 2025 NCAA Division I Men's Basketball Tournament. (Doc. 10 at ¶ 19).

Based on the above facts, it is undisputed that Johnson has exhausted his eligibility to play Division I basketball under the current NCAA Bylaws. Because Western Washington cancelled the 2020-2021 basketball season due to the effects of COVID-19, Johnson qualified for the NCAA's COVID-19 waiver and the 2020-2021 year did not count towards the four seasons of competition limit or his five years of eligibility. (Doc. 24 at ¶ 19). Counting Johnson's next three seasons of Division II basketball at Western Washington in 2021-2022, 2022-2023, and 2023-2024, and his one season of Division I basketball at the University of Montana in 2024-2025, Johnson has played four full seasons of basketball within a five-year period, thereby exhausting his eligibility to compete at the NCAA Division I level under the Challenged Rules.

Since 2021—following the United States Supreme Court's decision in *Alston v. NCAA*, 594 U.S. 69 (2021)—the NCAA has allowed student-athletes to earn compensation for their Name, Image, and Likeness ("NIL"). According to Johnson, the University of Montana has communicated to him that if he is granted an additional year of eligibility, he will be compensated roughly $100,000 in NIL. (Doc. 10 at ¶ 23). If Johnson is unable to play an additional season at the Division I level, however, he anticipates that his only realistic option to continue playing basketball will be in Europe, where he would likely earn between $30,000 and $40,000 for a nine-month season. (Doc. 10 at ¶ 24).

8

###    D.    Johnson's Waiver Requests

####    1.    Legislative Waiver Request

On March 5, 2025, the University of Montana submitted a waiver request on behalf of Johnson seeking an additional season of eligibility for Johnson based on extenuating circumstances related to his time at Western Washington. (Doc. 6-2 at 15-16; Doc. 23-3). The University of Montana acknowledged that the request did not meet the requirements for a season-of-competition waiver but asserted that "extenuating circumstances" beyond Johnson's control nevertheless warranted granting him an additional season of competition. (Doc. 6-2 at 15). The request asserted that unequal application of the COVID-19 waiver had allowed some student-athletes to compete in five seasons. (Doc. 6-2 at 15). Specifically, the request noted that unlike Western Washington, which cancelled its 2020-2021 season, other members of the Great Northwest Athletic Conference participated in some level of basketball competition during the 2020-2021 season. Because those players also received the COVID-19 waiver and were still eligible to compete for four seasons in Division I, Johnson asserted they were effectively given "the opportunity for five seasons of eligibility" and asked that he be given the same opportunity for a fifth season of competition in 2025-2026. (Doc. 6-2 at 15-16). Johnson's waiver request also referred to a blanket waiver issued by the NCAA in December 2024 providing certain former junior college athletes with the

opportunity to play an additional season and noted that former Division II student-athletes like Johnson have not been afforded the same benefit.[2] (Doc. 6-2 at 16).

Johnson also submitted a personal statement in support of his request. (Doc. 6-2 at 18-20). He identified several reasons for requesting an extra season of competition, including the lost COVID-19 year of competition, the missed opportunity earn NIL compensation, and his academic and mental health struggles while at Western Washington. (Doc. 6-2 at 18-20).

The NCAA construed the University of Montana's waiver request as a LRW and NCAA staff denied the request on March 12, 2025, on the ground that it did "not warrant relief of the legislation." (Doc. 6-2 at 22). NCAA staff concluded:

> (1) The NCAA Division I Counsel declined to extend an additional season of competition to student-athletes who did not utilize a season of competition during the 2020-21 season; (2) Student-athlete is being treated in a manner consistent with all student-athletes who did not use a season of competition during the 2020-21 season; and (3) During its March 30, 2022 meeting, the Division I Council Coordination Committee stated that season of competition waivers provided in consequence of the circumstances of the COVID-19 pandemic should not be used as a reason to provide a fifth season of competition to student-athletes who are now in different circumstances.

---

[2] In December 2024, the NCAA Division I Board of Directors approved a waiver which permits student-athletes who attended and competed at a non-NCAA school—such as a two-year college ("JUCO")—for one or more years to remain eligible to compete during the 2025-2026 academic year if those student-athletes would have otherwise used their final season of competition during the 2024-2025 academic year and meet all other eligibility requirements, including having time remaining in their period of eligibility. ("JUCO Waiver") (Doc. 6-2 at 38). The JUCO waiver does not apply to Johnson, who competed at the Division II level before moving to Division I.

(Doc. 6-2 at 22). According to the NCAA, since November 2021 it has received more than 35 requests for LRWs seeking the same relief, and NCAA staff or the Division I Committee for Legislative Relief has denied every request. (Doc. 24 at ¶ 27). The University of Montana did not appeal the decision by NCAA staff denying its waiver request to the Division I Committee for Legislative Relief. (Doc. 24 at ¶ 28).

### 2.    Season-of-Competition Waiver Request

On May 5, 2025—ten days after Johnson filed this lawsuit—the University of Montana filed an application for a season-of-competition waiver on Johnson's behalf based on "extenuating circumstances." (Doc. 24 at ¶ 29; Doc. 24-4 at 18-29). This waiver request asked the NCAA to except Johnson's 2021-2022 season at Western Washington from counting towards his four seasons of competition due to his ongoing mental health struggles arising from COVID-19. (Doc. 24 at ¶ 31; Doc. 24-4 at 18).

On May 14, 2025, NCAA SAR staff denied the request on the ground that it did not satisfy the requirements for a season-of competition waiver under Division II Bylaw 14.4.3.7. (Doc. 24 at ¶ 33; Doc. 24-4 at 30). In particular, the decision found that Johnson's participation during the 2021-2022 basketball season "exceeded the 30% legislated limit by 19 contests and [Johnson] competed in 13 contests during the second half of the season, including one postseason contest."

(Doc. 24-4 at 30). It is not clear whether Johnson has appealed this denial to the NCAA's SAR Committee.

### E.    Johnson's Complaint and Motion for Preliminary Injunction

On April 25, 2025, Johnson filed this action alleging that the NCAA's Five-Year Rule and related eligibility rules constitute per se violations and unreasonable restraints of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1. (Doc. 1 at ¶¶ 35-61). Johnson also asserts state law claims for tortious interference, breach of contract—third party beneficiary, promissory estoppel, and arbitrary enforcement (Doc. 1 at ¶¶ 62-131), and requests declaratory and injunctive relief (Doc. 1 at 132-147).

Johnson filed the pending motion for a preliminary injunction five days later, on April 30, 2025. (Doc. 6). Johnson seeks to enjoin the NCAA from enforcing the Challenged Rules. Johnson also seeks an order that his 2021-2022 season be considered a missed opportunity under NCAA Division I Bylaw 12.8.7.1.1., and that the waiver request he submitted on March 5, 2025, should have been granted, providing him with additional year of eligibility to play Division I basketball. Finally, Johnson asks the Court to enjoin the NCAA from enforcing the Rule of Restitution against Johnson or any NCAA member institutions. (Doc. 6).

## II.    <u>Preliminary Injunction Standards</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a plaintiff must establish four elements: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of an injunction, (3) that the balance of equities tips in the plaintiff's favor, and (4) that the injunction is in the public interest. *Winter*, 555 U.S. at 20. While the likelihood of success on the merits is the most important factor, *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017), a plaintiff "must satisfy all four *Winter* prongs in order to secure an injunction." *Cottonwood Envtl. Law Center v. U.S. Sheep Experiment Station*, 2019 WL 3290994 at *1 (D. Mont. July 22, 2019) (citing *Alliance of the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). The party seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).

The Ninth Circuit has adopted a "sliding scale approach to preliminary injunctions" whereby "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies*, 632 F.3d at 1131. The Ninth Circuit recognizes one such "approach under which a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor." *Alliance*

*for the Wild Rockies*, 632 F.3d at 1131 (citations and internal quotation marks omitted). As to the first *Winter* factor, "the serious questions standard is 'a lesser showing than likelihood of success on the merits.'" *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (quoting *Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)).

A preliminary injunction can take two forms—prohibitory or mandatory. *Idaho Anti-Trafficking Coalition v. Somerton*, 2025 WL 673928, at *4 (D. Idaho March 3, 2025) (citing *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GambH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). A prohibitory injunction is one that "prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals*, 571 F.3d at 879 (citations and internal quotation marks omitted). The status quo is "the last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting *Regents of the Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 514 (9th Cir. 1984)). In contrast, a mandatory injunction is one that "goes well beyond simply maintaining the status quo" and "orders a responsible party to take action." *Marlyn Nutraceuticals*, 571 F.3d at 879 (citations omitted).

Because they alter the status quo, mandatory injunctions are "particularly disfavored." *Marlyn Nutraceuticals*, 571 F.3d at 878-79; *see also Garcia v.*

*Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). A request for a mandatory preliminary injunction is therefore subject to "heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party." *Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993); *see also Garcia*, 786 F.3d at 740 (explaining that the plaintiff's burden in seeking a mandatory injunction is "doubly demanding" and requires the plaintiff to "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed") (emphasis in original). Mandatory injunctions are not generally "granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Doe. v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (quoting *Marlyn Nutraceuticals*, 571 F.3d at 879). "The Ninth Circuit has also implied that the 'serious questions' sliding scale inquiry for preliminary injunctions does not apply to mandatory injunctions." *Kennedy v. Meta Platforms, Inc.,* 2024 WL 4031486, at *15 (N.D. Cal. Sept. 3, 2024) (citing *Doe. v. Snyder*, 28 F.4th 103, 111 n. 4 (9th Cir. 2022)).

　　Here, Johnson is seeking a mandatory injunction. Although Johnson cites the more lenient sliding scale standard in his opening brief, he agreed at oral argument that the heightened standard for mandatory injunctions applies to his motion. The last uncontested status between the parties that preceded this controversy was at the end of the 2024-2025 basketball season, which marked Johnson's fourth year

of competition within five years. Johnson is asking the Court to prevent the NCAA

from enforcing the Challenged Rules that are currently in effect and alter the status

quo by granting him an additional season of competition he is not presently entitled

to. Johnson is also asking the Court to order that his March 5, 2025, waiver request

be granted, which would alter the status quo in the same way by giving him an

additional season of competition. *See Coley v NCAA*, 2025 WL 1616719, at *4

(E.D. N.C. June 6, 2025) (treating a student-athlete's motion to enjoin the NCAA

from enforcing the Five-Year Rule and Intercollegiate Competition Rule as a

request for a mandatory injunction that would alter the status quo); *Brzovic v.

NCAA*, 2025 WL 1370758, at *2-3 (D.S.C. May 11, 2025) (finding that a student-

athlete's request for a preliminary injunction to prevent the NCAA from enforcing

the Five-Year Rule would alter the status quo, making it a "mandatory

injunction"). Because Johnson seeks a mandatory injunction, the heightened

*Winter* standard applies.

## III.    Discussion

The Court's analysis begins and ends with the threshold question of whether

Johnson has established a clear likelihood of success on the merits of any of his

federal antitrust or state law claims.

### A.    Sherman Act Claims

The Sherman Act prohibits unreasonable restraints of trade or commerce.

16

*Nat'l Collegiate Athletics Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98

(1984). Section 1 of the Sherman Act prohibits "[e]very contract, combination in

the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

among the several States." 15 U.S.C. § 1. To prevail on an antitrust claim under

Section 1 a plaintiff must establish three elements: "(1) an agreement, conspiracy,

or combination between two or more entities; (2) an unreasonable restraint of trade

under either a per se or rule of reason analysis; and (3) the restraint affected

interstate commerce." *American Ad Management Inc. v. GTE Corp.*, 92 F.3d 781,

788 (9th Cir. 1996) (citations omitted).

　　Johnson's antitrust claims are based on the theory that because the

Challenged Rules limit student-athletes to four years of competition within a five-

year window, they also limit the ability of student-athletes to access NIL

compensation, and in doing so violate the antitrust provisions of the Sherman Act.

In particular, Johnson asserts that because access to NIL compensation at Division

II schools is far more limited than at Division I schools, enforcing the

Intercollegiate Competition Rule and counting his three seasons of competition at

Division II Western Washington toward the four years of competition permitted

under the Five-Year Rule constitutes an unreasonable restraint of trade that violates

the Sherman Act. (Doc. 11 at 13-14).

　　The NCAA counters that Johnson cannot show a clear likelihood of success

17

on the merits of his Sherman Act claims because: (1) the Challenged Rules are
non-commercial eligibility rules that are not subject to antitrust scrutiny; and (2)
even if the Sherman Act applies, Johnson has not demonstrated that the Challenged
Rules are an unreasonable restraint of trade under a rule of reason analysis.

   1. <u>Whether the Challenged Rules are subject to the Sherman Act</u>

  By its terms Section 1 of the Sherman Act applies only to "restraint[s] of
trade or commerce." 15 U.S.C. § 1. The Sherman Act "primarily was intended to
prevent unreasonable restraints in 'business and commercial transactions.'" *Smith
v. NCAA*, 139 F.3d 180, 185-86 (3d Cir. 1998), *vacated on other grounds*, 535 U.S.
459 (1999) (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940)); *see
also O'Bannon v. NCAA*, 802 F.3d 1049, 1065 (9th Cir. 2015) (describing
commercial activity as "activity from which the actor anticipates economic gain");
*Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008) ("In order to state a claim
under the Sherman Act there must be commercial activity implicated.").

  The NCAA argues the Court should not reach the merits of Johnson's
antitrust claims because the Challenged Rules do not regulate commercial activity,
and so fall outside the purview of the Sherman Act. The NCAA relies on the Ninth
Circuit's decision in *O'Bannon*, which recognized that "true eligibility rules" like
those challenged here are not commercial in nature. *O'Bannon*, 802 F.3d at 1066.

  The plaintiff in *O'Bannon* claimed that NCAA rules prohibiting student-

18

athletes from receiving compensation for the use of their NILs violated Section 1 of the Sherman Act. *O'Bannon*, 802 F.3d at 1052-53. Before evaluating the plaintiff's antitrust claims on the merits, the Ninth Circuit addressed the NCAA's threshold argument that the compensation rules were not subject to the Sherman Act at all because they were "mere 'eligibility rules' that [did] not regulate any 'commercial activity.'" *O'Bannon*, 802 F.3d at 1064-65. Although the compensation rules were "written in the form of eligibility rules" in that they provided that "an athlete who receives compensation other than the scholarships specifically permitted by the NCAA loses his eligibility for collegiate sports," the Ninth Circuit rejected the NCAA's argument and found that the substance of the rules mattered far more than how they were styled. *O'Bannon*, 802 F.3d at 1065. Because the rules "clearly regulate[d] the terms of commercial transactions between athletic recruits and their chosen schools" by limiting the amount of compensation a recruit could accept, the Ninth Circuit concluded that the challenged rules regulated "a quintessentially commercial transaction" and were thus within the ambit of the Sherman Act. *O'Bannon*, 802 F.3d at 1066.

But in reaching this conclusion the Ninth Circuit expressly distinguished "true eligibility rule[s]" such as those "limiting the number of years that student-athletes may play collegiate sports or requiring student-athletes to complete a certain number of credit hours each semester." *O'Bannon*, 802 F.3d at 1066.

*O'Bannon*'s reasoning is consistent with the Third Circuit's decision in *Smith v. NCAA*, which held that the Sherman Act did not apply to the NCAA's "Postbaccalaureate Bylaw" prohibiting athletes from participating in athletics at postgraduate schools other than their undergraduate schools. 139 F.3d at 185. The *Smith* court held that eligibility rules like the Postbaccalaureate Bylaw "are not related to the NCAA's commercial or business activities," and "[r]ather than intending to provide the NCAA with a commercial advantage, eligibility rules primarily seek to ensure fair competition in intercollegiate athletics." *Smith*, 139 F.3d at 185. *O'Bannon* cited *Smith* with approval, agreeing that "[t]he Post Baccalaureate Bylaw challenged in *Smith* was a true 'eligibility rule', akin to the [Five-Year Rule] limiting the number of years that student-athletes may play collegiate sports." *O'Bannon*, 802 F.3d at 1066.

Consistent with *O'Bannon*, the NCAA argues here that the Five-Year Rule and Intercollegiate Competition Rule are true eligibility rules, rather than commercial in nature, and so fall outside the purview of the Sherman Act. Johnson counters that the Supreme Court's decision in *NCAA v. Alston*, 594 U.S. 69 (2021) effectively abrogated the *O'Bannon* court's reasoning and requires this Court to conclude that the Challenged Rules are commercial in nature.

In *Alston*, the Supreme Court held that the NCAA violated antitrust laws by restricting the compensation and benefits that student-athletes could receive.

20

*Alston*, 594 U.S. at 107 (Kavanaugh, J., concurring). In response to *Alston,* the NCAA began allowing student-athletes to earn compensation for their NIL. *See e.g. Tennessee v. NCAA*, 718 F.Supp.3d 756, 759 (E.D. Tenn. 2024). Although *Alston* "drastically changed the landscape of college athletics" by allowing student-athletes to earn NIL compensation, Johnson reads its holding too broadly. *Tennessee*, 718 F.Supp.3d at 759. The Supreme Court made clear that its decision concerned "only a narrow subset of the NCAA's *compensation rules*," and noted there was no dispute "that the NCAA can require student athletes to be enrolled in good standing." *Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring) (emphasis added).

Johnson is not the first to argue that under *Alston,* eligibility rules like the Five-Year Rule and Intercollegiate Competition Rule are necessarily commercial and subject to antitrust analysis. But for the most part, district courts have been reluctant to interpret *Alston* so expansively. *See Brzovic*, 2025 WL 1370758 at *4; *Osuna Sanchez v. NCAA,* 2025 WL 684271 at *4 (E.D. Tenn. Mar. 3, 2025); *Goldstein v. NCAA*, 2025 WL 662809 (M.D. Ga. Feb. 28, 2025). In *Goldstein*, for example, the Middle District of Georgia noted that *Alston* focused only on a subset of compensation rules, and did not "touch the NCAA's bylaws that are true eligibility rules," like those that "limit the number of years student-athletes may play college sports." 2025 WL 662809, at *4 (cleaned up) (citing *O'Bannon*, 802

F.3d at 1066). *Goldstein* described the *Alston* decision as "more scalpel than ax," and relied on *O'Bannon* in concluding that the Five-Year Rule is not commercial in nature and therefore "not subject to antitrust scrutiny." *Goldstein*, 2025 WL 662809, at *4; *see also Brzovic*, 2025 WL 1370758 at *4 (rejecting the argument that under *Alston* the Five-Year Rule should be viewed "as commercial in nature and purpose, rather than merely an eligibility rule," noting that the Five-Year Rule "contains only regulations and guidance on student-athlete eligibility to participate in intercollegiate athletics" and says nothing about "business or commercial transactions"); *Coley v. NCAA*, 2025 WL 1616719, at *6 (E.D.N.C. June 6, 2025) (finding *Alston* did not compel the conclusion that the Sherman Act applies to NCAA eligibility bylaws, including the Five-Year Rule and Intercollegiate Competition Rule, simply because they "indirectly affect a student athlete's ability to earn NIL compensation" and concluding the challenged bylaws were not subject to antitrust scrutiny).

In *Osuna*, the Eastern District of Tennessee was similarly skeptical of the expansive interpretation of *Alston* urged on it by the plaintiff, but ultimately declined to definitively resolve the issue. As Johnson does here, the *Osuna* plaintiff advanced the theory that because "athletes can now earn NIL compensation, [] rules that affect their eligibility—and consequently their access to the market for NIL compensation—are commercial in nature" under *Alston. Osuna*, 2025 WL

684271 at *3. The court agreed that *Alston* "paved the way for a massive market

that provides compensation to college athletes for their name, image and likeness,"

but like its district court counterparts, noted that *Alston* focuses exclusively on a

narrow subset of compensation rules and nowhere "states that all NCAA eligibility

rules are commercial in nature." *Osuna*, 2025 WL 684271 at *3. *Osuna* observed

that *Alston* did not call the Ninth Circuit's *O'Bannon* decision into question, and

also did not invalidate the "rule-by-rule" analysis articulated by the Sixth Circuit in

*Worldwide Basketball & Sport Torus, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388

F.3d 955, 959 (6th Cir. 2008) ("[T]he appropriate inquiry is 'whether the rule itself

is commercial, not whether the entity promulgating the rule is commercial.'")

*Osuna*, 2025 WL 684271, at *3.

But *Osuna* also recognized the recent and "clearly evolving legal

landscape," including the Middle District of Tennessee's decision in *Pavia*, which

concluded that the Five-Year Rule and Intercollegiate Competition Rule are

commercial in nature as applied to former JUCO student-athletes because they

restrict who "is eligible to play and therefore to negotiate NIL agreements." *Osuna*,

2025 WL 684271, at *4; *see Pavia v. NCAA*, 760 F.Supp.3d 527, 532 (M.D. Tenn.

2024), *appeal filed* (6th Cir. Dec. 26, 2024)[3]. *Osuna* recognized the tension

---

[3] The NCAA enacted the JUCO waiver in response to *Pavia*, which is currently on
appeal to the Sixth Circuit.

between *Pavia* and *Goldstein*, but declined "to resolve these tensions" because even assuming the JUCO rule was commercial, the plaintiff had not established a strong likelihood of success on his Sherman Act claim under the rule of reason analysis. *Osuna*, 2025 WL 684271, at *4.

This Court reads *Alston* the same way that *Goldstein, Brzovic, Coley*, and *Osuna* do. As *O'Bannon* instructs, the Challenged Rules are true eligibility rules and nothing in *Alston* changes that. Because the Challenged Rules are true eligibility rules, they are not commercial in nature and are not subject to antitrust scrutiny under the Sherman Act. But even if the Challenged Rules are commercial and fall within the purview of the Sherman Act, Johnson has not shown a clearly likelihood of success on the merits as required to obtain mandatory preliminary injunctive relief against the NCAA.

>    2.    Whether Johnson's Sherman Act claims are likely to survive under the Rule of Reason

Johnson's Complaint alleges two federal antitrust claims under Section 1 of the Sherman Act: a per se claim (Count 1) and an unreasonable restraint of trade claim (Count 2). (Doc. 1 at ¶¶ 35-61). At the preliminary injunction stage, Johnson has the burden of clearly demonstrating that he is likely to succeed in establishing the three elements of a Section 1 antitrust claim: "(1) an agreement, conspiracy, or combination between two or more entities; (2) an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected

interstate commerce." *American Ad Management*, 92 F.3d at 788.  (citations omitted).

The NCAA does not contest the first two elements but argues Johnson cannot establish that the Challenged Rules are an unreasonable restraint of trade under the rule of reason analysis. "A small group of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output. Typically, only 'horizontal' restraints—restraints 'imposed by agreement between competitors—qualify as unreasonable per se. Restraints that are not unreasonable *per se* are judged under the 'rule of reason.'" *Ohio v. American Express Co.*, 585 U.S. 529, 540 (2018) (internal citations and punctuation omitted). Although Johnson suggested in briefing that the per se standard applies (Doc. 11 at 17), he agreed at oral argument that, like most restraints, the Challenged Rules are properly analyzed using the rule of reason. *See Alston*, 594 U.S. at 87-95 (affirming application of the rule of reason to Sherman Act claims challenging NCAA compensation rules); *NCAA v. Board of Regents,* 468 U.S. 86, 103, 117 (1984); *O'Bannon*, 802 F.3d at 1057-64 (applying rule of reason to NCAA compensation rules, and reading *Board of Regents* as holding that "because many NCAA rules (among them, amateurism rules) are part of the character and quality of the NCAA's product, no NCAA rule should be invalidated without a Rule of Reason analysis") (internal citation and punctuation omitted).

The rule of reason requires "a fact-specific assessment of market power and market structure to assess a challenged restraint's actual effect on competition." *Alston*, 594 U.S. at 81 (internal quotation marks). To determine whether a restraint violates the rule of reason, courts use a three-step, burden shifting framework. *American Express*, 585 U.S. at 541. First, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. *American Express*, 585 U.S. at 541. If the plaintiff meets this burden, "then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *American Express*, 585 U.S. at 541. "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *American Express*, 585 U.S. at 541.

a.    *Relevant Market*

Before the district court can assess whether a challenged restraint has an anticompetitive effect, it "must first define the relevant market." *American Express*, 585 U.S. at 542. Without an accurate definition of the relevant market, "there is no way to measure the defendant's ability to lessen or destroy competition." *American Express*, 585 U.S. at 543 (quoting *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965)). The relevant market is generally defined as "the area of effective competition,"

26

which is typically the "arena within which significant substitution in consumption or production occurs." *American Express*, 585 U.S. at 543.

An antitrust plaintiff has the burden of proving the scope of the relevant market, which has two components: the relevant product market and the relevant geographical market. *Western Parcel Express v. UPS of America*, 65 F.Supp.2d 1052, 1058 (N.D. Cal. 1998) (citing *United States v. Grinnell*, 384 U.S. 563, 575-76 (1966)). The validity of the relevant market is typically a factual matter. *Newcal Industries, Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1045 (9th Cir. 2008). In practice, economists are often used "to explain the relevant market and to measure the impact of the allegedly illegal conduct." *Western Parcel*, 65 F.Supp.2d at 1058; *see also Sidibe v. Sutter Health*, 2019 WL 2078788 at **26-27 (N.D. Cal. May 9, 2019) (recognizing that plaintiffs frequently present expert testimony to define the relevant market but there is no per se requirement in the Ninth Circuit that they do so); *Goldstein*, 2025 WL 662809, at *5 (noting the absence of expert testimony and its importance because "expert assessment ties directly into [the plaintiff's] antitrust claim and his likelihood of success on the merits for that claim as it relates to his efforts to obtain a preliminary injunction").[4]

---

[4] *Goldstein* is a Middle District of Georgia case, and the Eleventh Circuit has "gone farther" than the Ninth Circuit in holding that construction of the relevant market must be based on expert testimony. *Sidibe*, 2019 WL 2078788, at *26 (citing *Semiconductor Inc. v. Rambus Inc.*, 2008 WL 73689, at *10 n. 13 (N.D. Cal. Jan. 5, 2008)).

Here, Johnson relies on the market definition used in *Alston* and asserts that "the relevant market is the nationwide labor market for Division I basketball players." (Doc. 11 at 19). In *Alston,* the Supreme Court adopted the definition used by the district court based on the evidence and expert testimony presented at trial and agreed that "NCAA's Division I essentially is the relevant market for elite college [sports]." *Alston*, 594 U.S. at 81. The NCAA in *Alston* did not contest "that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition," and "that student-athletes have nowhere else to sell their labor."[5] 594 U.S. at 90.

The Middle District of Tennessee and Western District of Wisconsin have done what Johnson proposes here and relied on *Alston* at the preliminary injunction stage to define the relevant market in cases challenging the Five-Year Rule on antitrust grounds. *Pavia*, 760 F.Supp.3d at 539; *Fourqurean v. NCAA*, 2025 WL 993975, at *4 (W.D. Wisc. Feb. 6, 2025), *interlocutory appeal filed* (7th Cir. Feb. 7, 2025). In *Pavia*, the plaintiff asserted the relevant market was "the labor market for college football athletes in general and NCAA Division I football specifically." *Pavia,* 760 F.Supp.3d at 539. Although the NCAA argued the plaintiff had not

---

[5] Monopsony is a "market situation in which one buyer controls the market." Black's Law Dictionary (12th ed. 2024). *Alston* describes it as the buyer-side equivalent of a monopoly. 594 U.S. at 86.

offered any evidence to support the proposed market definition, it did not dispute that the proposed market was relevant market for purposes of the court's antitrust analysis. *Pavia*, 760 F.Supp.3d at 539. In *Fourqurean,* the court acknowledged that the plaintiff had not defined the relevant market, but found the Supreme Court "ha[d] already defined it" and simply adopted the *Alston* court's definition. *Fourqurean*, 2025 WL 993975, at *4.

The NCAA argues here that because Johnson has not provided any expert testimony or supporting evidence, he cannot establish that the relevant market should be defined as it was in *Alston* to be the nationwide labor market for Division I basketball players. (Doc. 23 at 39). The NCAA contends Johnson must offer evidence showing that the product market is limited to Division I basketball players to overcome his own admissions that basketball opportunities exist for him outside Division I—as evidenced by the fact that he formerly competed for three years in Division II and is now considering opportunities in professional leagues. (Doc. 23 at 39, citing Doc. 10 at ¶¶ 4, 24). According to the NCAA, the record as it currently stands thus suggests there is demand for the same pool of basketball players among the different NCAA divisions and between the NCAA and professional leagues, and the appropriate market definition may include these substitutes for NCAA student-athletes' labor. The NCAA further contends that Johnson has not offered any evidence that the geographic market should be limited

to the United States, particularly given Johnson's allegation that he is considering playing basketball in Europe. (Doc. 23, at 39, citing Doc. 10 at ¶ 24).

Although the NCAA argues Johnson must present additional evidence to support application of *Alston*'s market definition, *Pavia* and *Fourqurean* both relied on *Alston*'s market definition without requiring additional evidence from the plaintiff. The *Pavia* court noted that a number of "courts considering antitrust challenges to NCAA eligibility rules have found that the labor market for college athletes"—in this case college basketball— "to be the relevant labor markets," which supported application of the *Alston* definition. *Pavia*, 760 F.Supp.3d at 539 (citing *Alston*, 594 U.S. at 90 ("market for student athlete services"); *Tennessee*, 718 F.Supp.3d at 761-62 ("market for Division I athletics"); *Ohio et al. v. NCAA*, 706 F.Supp.3d 583, 592 (N.D. Ill. 2024) (finding that "labor markets within NCAA Division I college athletics in the United States are the relevant antitrust markets"). *Fourqurean* followed the same approach. The district court granted the plaintiff's motion to preliminarily enjoin the NCAA from enforcing the Five-Year Rule, and in doing so adopted *Alston*'s definition of the relevant market. Although the NCAA objected that the plaintiff had not provided evidence of the relevant market, the court found it was not necessary for him to do so because *Alston* had already defined the relevant market as the nationwide labor market for Division I student-athletes. *Fourqurean*, 2025 WL 993975, at *4.

For present purposes, the Court will do the same and accept at this preliminary stage that the relevant market is the nationwide labor market for Division I basketball players. Most recently, the Middle District of Tennessee charted a different course. *But see Zeigler v. NCAA*, 2025 WL 1671952, at *3-4 (E.D. Tenn. June 12, 2025) (recognizing that current market realities have fundamentally changed since *Alston,* and reasoning that because the NCAA does not control who receives NIL compensation—the wage side of the market—the plaintiff had not shown that the Five-Year Rule produces substantial anticompetitive effects in the relevant "market for student-athlete services and NIL compensation in Division I basketball").

> b.    *Substantial Anticompetitive Effect*

But even accepting Johnson's definition of the relevant market, he has not offered evidence of a substantial anticompetitive effect as required to satisfy the first step of rule of reason analysis. A plaintiff can prove substantial anticompetitive effects through direct or indirect evidence. *American Express*, 585 U.S. at 542. Relevant here, "indirect evidence of substantial anticompetitive effects requires 'proof of market power plus some evidence that the challenged restraint harms competition.'" *Osuna*, 2025 WL 684271, at *4 (quoting *American Express*, 585 U.S. at 542).

Johnson does not cite to any evidence in the record to establish a substantial anticompetitive effect and instead relies exclusively on caselaw. (Doc. 11 at 20). He cites *Alston* for the proposition that the NCAA's monopsony power is undisputed, and asserts based on *Pavia* and *Fourqurean* that the Challenged Rules harm competition in main two ways: (1) by limiting the pool of Division I athletes based on their Division II participation, harming team competitiveness; and (2) "by limiting [his] Division I eligibility based on his Division II participation, where NIL opportunities were virtually nonexistent," thereby "costing [him] a substantial amount of NIL earnings." (Doc. 11 at 20). *See Alston*, 594 U.S. at 90 (noting that the NCAA in that case "accepted that its members collectively enjoy monopsony power in the market for student-athlete services"); *Pavia*, 760 F.Supp.3d at 539 (concluding that counting JUCO time against Division I "harms the competitiveness of teams by limiting the number of years these players can compete at the Division I level" and has anticompetitive effects by restricting "who can compete (and earn NIL compensation) and for how long"); *Fourqurean*, 2025 WL 993975, at *4 (finding the Five-Year Rule "has an anticompetitive effect on the market for student-athletes" by limiting eligibility and NIL economic opportunities for athletes).

But the Court is not convinced that Johnson can satisfy his initial burden of proof under the rule of reason analysis simply by relying on preliminary injunction

orders issued in other cases. Particularly in light of the heightened standard that applies to his request for mandatory injunctive relief, the Court finds that Johnson has not offered sufficient evidence to establish that the Challenged Rules have a substantial anticompetitive effect on the relevant market. *See e.g. Coley*, 2025 WL 1616719, at *9 (concluding that declarations addressing only the plaintiff as a player and his ability to earn NIL compensation were insufficient to establish a substantial anticompetitive effect because they said "nothing about a substantial anticompetitive effect on the labor market as a whole); *Brzovic*, 2025 WL 1370758, at *4 (concluding the court was without sufficient evidence at the TRO and preliminary injunction stage to determine whether the Five-Year Rule causes anticompetitive harm under the rule of reason analysis).

First, to the extent Johnson asserts that the Challenged Rules harm team competitiveness by limiting the pool of Division I athletes based on their Division II participation, he has not provided any evidence demonstrating that this is so. The Sherman Act protects "competition, not competitors." *American Ad Mgmt. Inc. v. General Telephone Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962)). Although the Challenged Rules undeniably affect Johnson because they render him ineligible to compete in another season of Division I basketball, he has not shown that his ineligibility has any impact on the degree of competition between the pool of

33

potentially eligible players. *See McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 812 (9th Cir. 1988) ("The elimination of a single competitor, without more, does not prove anticompetitive effect."). Nor has Johnson provided evidence demonstrating that the Challenged Rules harm the level of team competition on a market-wide basis, or harm competition among basketball players by excluding players who, like Johnson, are no longer eligible to play. Under the NCAA's current eligibility framework, every outgoing set of ineligible players is replaced by an incoming set of eligible players entering Division I programs, and Johnson has not offered any evidence that this framework harms the level of competition on or between Division I teams. *See Fieler v. Chrysler Corp.*, 1994 WL 478721, at *2 (N.D. Cal. Aug. 24, 1994) ("The replacement of one supplier by another, even if financially harmful to the former supplier, does not constitute antitrust injury.") (citing *McGlinchy*, 845 F.2d at 811-12).

Second, Johnson has not provided evidence that the Challenged Rules have a substantial anti-competitive effect on the relevant market as a whole by limiting eligibility and, consequently, access to NIL compensation. Again, the Challenged Rules undeniably affect Johnson by rendering him ineligible for an additional season of Division I competition, during which he anticipates he would earn $100,000 in NIL compensation. But this is not sufficient to establish a substantial anti-competitive effect under the rule of reason analysis. *See Brzovic,* 2025

1370758 at *4 (finding the plaintiff—who competed in Division II for one year and Division I for three years—failed to satisfy the first step of the rule of reason analysis because he did not point "to any objective evidence of market-wide harms to competition or consumers beyond maintaining that enforcement of the Five-Year Rule will result in loss of his eligibility and harm to his NIL opportunities"); *Coley*, 2025 WL 1616719 at *9 (concluding that although the plaintiff's "declaration and the 'indirect' evidence of his collegiate football career support the conclusion that the Challenged Bylaws impacted [his] ability to earn additional NIL compensation," that evidence fell "short of supporting [his] conclusion that the Challenged Bylaws have a substantial anticompetitive effect on the market as a whole").

Johnson does not allege or provide any evidence that the Challenged Rules deprive student-athletes of the opportunity to compete for Division I opportunities and NIL compensation during their periods of eligibility. Nor does he allege or provide evidence that the Challenged Rules somehow prevent Division I schools from competing for the services provided by student-athletes during their period of eligibility. To the contrary, as argued by the NCAA, if anything the Challenged Rules likely tend to increase competition among member schools for eligible student-athletes, thereby driving up potential NIL compensation on a market-wide scale. *See Arbolida v. NCAA*, 2025 WL 579830, at *3 (D. Kan. Feb. 21, 2025)

("The current eligibility rules … seem to increase competition among NCAA member institutions … for the limited supply of potential labor, thereby driving up potential compensation for labor market participants."); *Osuna*, 2025 WL 684271 at *7 (citing *Arbolida* and finding this reasoning persuasive); *Zeigler*, 2025 WL 1671952 at *4 (finding the plaintiff had not shown that the NCAA's "limit on the labor side of the market—replacing one Division I basketball player with another—produces substantial anticompetitive effects" and citing evidence "demonstrating that limiting labor—who can play—may increase wages—NIL compensation—and that increasing labor may actually decrease wages"). Because Johnson has not provided any objective evidence of market-wide harms to competition beyond asserting that enforcement of the Five-Year Rule and the Intercollegiate Competition Rule will result in loss of his eligibility and harm to his NIL opportunities, he has not met his initial burden of establishing that the Challenged Rules have a substantial anti-competitive effect.

In his reply brief, Johnson additionally argues—again without providing any evidence—that the Challenged Rules harm competition because "Division I institutions compete directly with Division II institutions for prospective student-athletes, with significant advantages by virtue of the Division I market—more exposure, better competition, better coaching, and significant financial advantages due to the NIL opportunities disproportionately offered to Division I athletes."

(Doc. 29 at 11). As the Court reads it, Johnson's argument is essentially that Division II schools are at a disadvantage when competing against Division I schools for student-athletes. But as *Osuna* found when addressing a similar argument that "junior colleges face difficulties when competing against Division I schools for athletes," the problem is that the plaintiff "defines the relevant market as the market for Division I athletics, and junior colleges are not part of this market." *Osuna*, 2025 WL 684271, at *5. The same is true here. Because Johnson defines the relevant market as the market for Division I basketball, any "purported harms to actors outside this market," such as Division II schools, "cannot factor into the Court's analysis." *Osuna*, 2025 WL 684271, at *5. But even if this was a viable theory, Johnson has not offered any supporting evidence as required to establish that such an anticompetitive effect exists.

Again emphasizing the limited evidentiary record and the heightened *Winter* standard that applies to Johnson's motion, the Court concludes Johnson has not shown that the facts and law clearly favor him on this issue. Accordingly, the Court finds that Johnson has not demonstrated that the Challenged Rules likely have a substantial anticompetitive effect in the nationwide labor market for Division I basketball as required to satisfy the first step of the rule of reason analysis.

Although this conclusion means it is not necessary to reach steps two and

three of the rule of reason analysis, the Court addresses them here briefly because even if Johnson could establish a substantial anti-competitive effect, he has not shown that his antitrust claims are likely to survive the final steps of the burden-shifting framework.

c.    <em>Procompetitive Rationale</em>

At step two of the rule of reason analysis, the NCAA has the burden to show a procompetitive rationale for the challenge restraint. *American Express*, 585 U.S. at 541. The NCAA argues its eligibility rules generally, and the Challenged Rules in particular, are procompetitive because they are tailored to promote the creation of "intercollegiate competition," and without eligibility rules defining "student-athletes," the NCAA would be just another minor league or semi-professional feeder of professional sports leagues. (Doc. 23 at 46).

A number of pre-*Alston* cases recognized the procompetitive value of NCAA eligibility rules like the Challenged Rules. *See e.g. Agnew v. NCAA*, 683 F.3d 328, 343 (7th Cir. 2012) ("Most—if not all—eligibility rules . . . fall comfortably within the presumption of procompetitiveness afforded to certain NCAA regulations" because those regulations in college sports are "necessary for the product to exist."); *McCormack v. NCAA*, 845 F.2d 1338, 1345 (5th Cir. 1988) ("The goal of the NCAA is to integrate athletics with academics" and eligibility "requirements reasonably further this goal"). In this Court's view, the availability

of NIL compensation in the wake of *Alston* and the recent court-approved

settlement in *House v. NCAA*, Case No. 4:20-cv-03919-CW, Doc. 978 (N.D. Cal.

June 6, 2025)[6] arguably foreclose the NCAA from credibly asserting its tradition

of promoting amateurism as a procompetitive justification for the Challenged

Rules. While the availability of NIL compensation has without question changed

the landscape of college athletics, those changes do not mean that there is no

procompetitive rationale for the NCAA's eligibility rules. Even the *Fourqurean*

court found that linking a student-athlete's college athletic career to academic

progress is a legitimate procompetitive rationale for placing eligibility restraints on

competition. *Fourqurean*, 2025 WL 993975 at *5.

Here, Hataway states in a supporting declaration that "the Challenged Rules

are motivated by the concept that the length of time a student is enrolled in

undergraduate education should bear a relationship to the length of time that the

student should be permitted to participate in intercollegiate athletics," and

"[t]raditionally, four years are need to complete an undergraduate education or to

earn a baccalaureate degree." (Doc. 24 at ¶ 11). The NCAA has demonstrated that

linking eligibility to compete in college athletics with academic progress—thereby

integrating athletics with academics—is a legitimate procompetitive rationale for

---

[6] Johnson has submitted a copy of the Opinion Regarding Order Granting Motion
for Final Approval of Settlement Agreement in the *House* litigation. (Doc. 31).

the Challenged Rules. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 101, 117 (1984) (recognizing that certain horizontal restraints, such as the eligibility of participants, are justifiable because they are essential if the product of college sports is to be available at all).

    d.   *Less Restrictive Means*

At the last step of the rule of reason analysis, Johnson has the burden "to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *American Express*, 585 U.S. at 541. Johnson does not directly address this part of the rule of reason analysis but relies on *Fourqurean* to assert that he has been prejudiced by the NCAA's failure to adopt and apply any meaningful exceptions to the Five-Year Rule. (Doc. 11 at 21). *Fourqurean*, 2025 WL 993975 at *6 (finding that having "meaningful" exceptions to the Five-Year Rule "would be a less restrictive means while still allowing for a robust differentiation between college and professional [athletic performance] products"). Johnson contends that a preliminary injunction pertaining only to him, granting him one additional year of eligibility related to his unique individual circumstances and prior competition at a Division II institution, would be limited in scope and would not affect other NCAA eligibility rules. (Doc. 29 at 15).

To the extent Johnson is seeking to enjoin the NCAA from enforcing the Challenged Rules in their entirety, including particularly the provision that non-

Division I competition constitutes "intercollegiate competition," his arguments can be interpreted as asking the Court to revise the Challenged Rules so that student-athletes have a separate Division I eligibility clock that does not begin to run until full-time enrollment in a Division I member institution. But as the NCAA points out, the *Fourqurean* court rejected this less-restrictive means argument because "it would arguably all but end any distinction between college and professional football," and "Division II and Division III [athletic] programs would become nothing more than minor league teams for the most powerful Division I [athletic] programs." *Fourqurean*, 2025 WL 993975, at *6.

Although Johnson's motion can be read as seeking a nationwide injunction broadly enjoining the NCAA from enforcing the Challenged Rules (Doc. 6), Johnson's arguments at this step of the rule of reason analysis suggest he is requesting "an injunction pertaining only to [him]" as a less-restrictive alternative on the theory that the NCAA should have granted his March 5, 2025, request for a waiver. (Doc. 29 at 15). But as countered by the NCAA, Johnson's request for a one-person exception would represent a metering of "small deviations" to achieve the procompetitive benefits of the Challenged Rules, which *Alston* instructs is "not an appropriate antitrust function." (Doc. 23 at 51 (quoting *Alston*, 594 U.S. at 99). To the extent Johnson challenges the NCAA's denial of his waiver request, his argument is addressed separately below. For purposes of the rule of reason

41

analysis, Johnson has not met his burden "to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *American Express*, 585 U.S. at 541.

In sum, the Court concludes that the Challenged Rules are not subject to antitrust scrutiny, but even if they are, Johnson has not made a clear showing that he is likely to succeed on his claims that the Challenged Rules are an undue restraint on trade in violation of the Sherman Act under a rule of reason analysis.

### B.    Waiver Request

The University of Montana submitted two waiver requests on Johnson's behalf: (1) the March 5, 2025, LRW request seeking an additional year of eligibility based on extenuating circumstances—namely, unequal application of the COVID-19 waiver, his mental and academic struggles, and the missed opportunity to earn NIL compensation (Doc. 24-3); and (2) the May 5, 2025, season-of-competition waiver asking the NCAA to except Johnson's 2021-2022 season based on extenuating circumstances—namely, his ongoing mental health struggles during his sophomore year. (Doc. 24-4).

Johnson's preliminary injunction motion—which was filed days before his May 5, 2025 waiver request—asks the Court to order that his "2021-2022 season be considered a missed opportunity under NCAA Division I Bylaw 12.8.1.7.1.1," and that the March 5, 2025, waiver he requested should have been granted, thereby

making him eligible to compete for the University of Montana in the upcoming 2025-2026 basketball season. (Doc. 6 at ¶ 2).

The NCAA construed Johnson's first waiver request as a LRW and denied it on March 12, 2025. (Doc.  Doc. 6-2 at 22). According to Hataway, since November 2021 the NCAA has received more than 35 requests for LRWs seeking the same relief, and NCAA staff or the Division I Committee for Legislative Relief has denied every request. (Doc. 24 at ¶ 27). Johnson did not appeal the initial decision to the NCAA's Division I Committee for Legislative Relief. (Doc. 24 at ¶ 28).

To the extent Johnson's request for a Court order giving him an additional season of competition can be construed as an attempt to appeal the decision denying his waiver request, the NCAA argues his claim cannot succeed because the Court is not empowered to hear appeals from NCAA bylaw waiver determinations. (Doc. 23 at 51). Johnson does not argue otherwise. (Doc. 29).

Johnson has, however, alleged state law claims based in part on the NCAA's alleged wrongful denial of his waiver request. Whether Johnson has shown that he is clearly likely to succeed on the those claims, which he asserts would entitle him to injunctive relief in the form of an order directing the NCAA to provide him with another season of eligibility, is addressed below.

### C.    State Law Claims

43

1.    <u>Tortious Interference</u>

Johnson's Complaint includes two Montana common-law claims for tortious interference, the first of which is for tortious interference with contract. (Doc. 1 at ¶¶ 62-70). Johnson alleges he has a contractual relationship with the University of Montana, pursuant to which he is entitled, and indeed expected, to participate on the varsity basketball team. He claims the NCAA interfered with that relationship by refusing to grant him a waiver when he was entitled to one, acting arbitrarily and capriciously with regard to his eligibility, ignoring his rights, and violating the NCAA's own rules and guidelines. (Doc. 1 at ¶¶ 63-67). Johnson has also pled a claim for tortious interference with his prospective business relationship with third parties for the use of his NIL. He claims the NCAA interfered with these relationships by enforcing its eligibility rules and denying his waiver request, thereby reducing his marketability and earnings potential. (Doc. 1 at ¶¶ 71-81)

The NCAA argues Johnson is not likely to succeed on his claim for tortious interference with contract because, as pled elsewhere in the Complaint, he does not presently have a contract with the University of Montanan. Rather, Johnson has alleged he was set to graduate from the University of Montana last month and only "plans to pursue a post-graduate degree if granted an additional year of eligibility." (Doc. 1 at ¶ 34). Absent a contract, the NCAA argues his claim is, at best, one for tortious interference with business expectancy. (Doc. 23 at 53).

At oral argument, Johnson confirmed that his state law claims, including claim for tortious interference, rely on his business expectancy with the University of Montana, not with the NCAA. Under Montana law, the "essential elements of tortious interference with business relations or prospective economic advantage are: (1) an intentional act or conduct by the alleged tortfeasor; (2) performed by the tortfeasor 'without right or justifiable cause'; (3) performed for the purpose of causing damage or loss to another; and (4) resulting damages." *Associated Management Service, Inc. v. Ruff*, 424 P.3d 571, 596 (Mont. 2018). A claim for "tortious interference requires proof of malice in the legal sense—that the defendant acted wrongfully, unlawfully, without justification or excuse." *Rocky Mountain Biologicals, Inc. v. Microbix Biosystems, Inc.*, 986 F.Supp.2d 1187, 1200 (D. Mont. 2013); *see also Richland Partners, LLC v. Cowry Enterprises, Ltd.*, 2015 WL 860808, at *6 (D. Mont. Feb. 27, 2015); *Maloney v. Home Investment Center, Inc.*, 994 P.2d 1124, 1132 (Mont. 2000) ("[U]nlike interference with contractual relations, intentional interference with either 'business relations' or 'prospective economic advantage' does not require that a contract exist between any of the involved parties. Rather, the focus of the legal inquiry is on the intentional acts of the 'malicious interloper' in disrupting a business relationship.").

Although Johnson asserts the NCAA intentionally denied his waiver request

without right or justifiable cause, he has not identified any evidence to support

acted with the requisite level of intent in enforcing its eligibility rules and denying

his waiver request, which means he has not shown that law and facts are clearly in

his favor on his claim for tortious interference with business expectancy.

### 2. Breach of Contract (Third-Party Beneficiary) and Promissory Estoppel

Johnson's Complaint also includes a Montana common-law claim for breach

of contract as a third-party beneficiary. (Doc. 1 at ¶¶ 82-100). Johnson alleges he is

the third-party beneficiary of the NCAA's agreements with its member institutions,

including the University of Montana, which allow those "institutions access to the

college sports market as administered and controlled by the NCAA." (Doc. 1 at ¶

90). Johnson alleges the NCAA breached the agreements by arbitrarily and

capriciously denying him "the ability to play collegiate sports for an additional

year in contravention of its own rules, regulations, bylaws, and guidelines." (Doc.

1 at ¶¶ 93-95).

Under Montana law, "simply expecting to benefit from the performance of a

contract does not grant a non-party the intended third-party beneficiary status

necessary to enforce a contract." *Deschamps v. Farwest Rock, Ltd.,* 474 P.3d 1282,

1286 (Mont. 2020). Johnson does not cite any caselaw in support of his theory that

student-athletes are entitled to recover as third-party beneficiaries to contracts

between the NCAA and its member institutions. Particularly given the Montana

46

Supreme Court's general "reluctan[ce] to find that third parties are intended beneficiaries with a right of enforcement," Johnson has not shown that he is likely succeed on the merits. *Deschamps*, 474 P.3d at 1287.

But even accepting Johnson's argument that he is a third-party beneficiary of an agreement between the NCAA and the University of Montana with respect to the eligibility waiver process, Johnson has not come forward with evidence that the NCAA clearly violated his expectations by denying his waiver request. To the contrary, although Johnson's waiver request asserted unequal application of the COVID-19 waiver, the NCAA explained in its decision that: (1) the Division I Counsel had declined to extend an additional season of competition to student-athletes who did not use a season of competition during the 2020-21 season; (2) Johnson was "being treated in a manner consistent with all student-athletes who did not use a season of competition during the 2020-21 season," and (2) a Division I committee had previously determined that "season of competition waivers provided in consequence of the circumstances of the COVID-19 pandemic should not be used as a reason to provide a fifth season of competition to student-athletes who are now in different circumstances." (Doc. 6-2 at 22). And according to Hataway, since November 2021 the NCAA has received more than 35 request for LRWs seeking the same relief, and NCAA staff or the Division I Committee for Legislative Relief has denied every request. (Doc. 24 at ¶ 27). On this record,

Johnson has not established a clear likelihood of success on a third-party beneficiary theory of recovery.

Johnson's promissory estoppel claim alleges that the NCAA has promised student-athletes that it will apply its bylaws fairly and will follow its guidelines when considering whether to grant waiver requests, and that Johnson reasonably relied on these promises to his detriment when making decisions regarding attending college. (Doc. 1 at ¶¶ 102-114). To establish a prima facie claim of promissory estoppel, a plaintiff must establish, among other elements, "a promise clear and unambiguous in its terms." *Turner v. Wells Fargo Bank, N.A.*, 291 P.3d 1082, 1088 (Mont. 2012). As the NCAA points out, Johnson's complaint is that the NCAA *did* follow the Challenged Rules but wrongly denied his waiver request. But because Johnson does not allege facts demonstrating that the NCAA made him a clear and unambiguous promise that he would get the waiver he wants, he has not demonstrated a likelihood of success on his promissory estoppel claim.

### 3.    Arbitrary Enforcement

Finally, Johnson's Complaint includes a claim for "arbitrary enforcement" asserting that the NCAA has arbitrarily enforced Division I Bylaw 12.8.1.7.1.1 by granting a blanket waiver to former JUCO athletes in the wake of the *Pavia* decision, but not granting a similar waiver to former Division II athletes like Johnson. (Doc. 1 at ¶¶ 115-131). On its face, this theory has some appeal. But the

legal basis for such a claim under Montana law is unclear, as Johnson does not cite any legal authority in his opening brief. (Doc. 11 at 23). In his reply brief, Johnson invokes the implied covenant of good faith and fair dealing which requires "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." (Doc. 29 at 18-19, citing Mont. Code ann. § 28-1-211). But Johnson does not cite caselaw applying the implied covenant in similar circumstances or to analogous claims. Even assuming this could be a viable legal theory, at this stage in the proceedings Johnson has not established that he is clearly likely to succeed on the merits.

## IV.    **Conclusion**

For the reasons discussed above, the Court concludes: (1) the Challenged Rules are not subject to antitrust scrutiny, but even if they are, Johnson has not demonstrated a clear likelihood of success on the merits of his Sherman Act claims; and (2) Johnson has not demonstrated a clear likelihood of success on the merits of his claims under Montana law.[7] Because Johnson has not established a clear likelihood of success on the merits, the Court need not address the remaining *Winter* factors. *See Disney*, 869 F.3d at 856 (if the plaintiff fails to establish a likelihood of success, the court need not consider the other *Winter* factors).

---

[7] Because Johnson is not entitled to a preliminary injunction enjoining application of the Challenged Rules, the Court need not address his request to enjoin the Rule of Restitution.

Accordingly, IT IS ORDERED that Johnson's Motion for a Preliminary Injunction (Doc. 6) is DENIED.

DATED this 26th day of June, 2025.

_____
Kathleen L. DeSoto
United States Magistrate Judge